## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

MARC BEVAND,

      Plaintiff,

vs.

BF LABS INC., d/b/a BUTTERFLY LABS,
**Serve**:
**National Corporate Research, Ltd.**
**1107 W 6th Ave Ste B**
**Cheyenne, WY 82001**

SONNY VLEISIDES,
**Serve**:
**Sonny Vleisides**
**9817 Walnut St.**
**Kansas City, MO 64108**

DARLA JO DRAKE a/k/a JODY DRAKE,
**Serve**:
**Darla Jo Drake**
**9324 W 51st St**
**Shawnee, KS 66203**

JEFF OWNBY,
**Serve**:
**Jeff Ownby**
**130 N Park Rd**
**La Grange, IL 60525**

and

JOSHUA ZERLAN,
**Serve:**
**Joshua Zerlan**
**26163 W 108th Terrace**
**Olathe, KS 66061**

      Defendants.

Cause No.

Division No.

PLAINTIFF DEMANDS
TRIAL BY JURY

1

## COMPLAINT

Plaintiff Marc Bevand brings this Complaint for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of contract, unjust enrichment, conversion and violation of the Missouri Merchandising Practices Act ("MMPA") against Defendants BF Labs, Inc. d/b/a Butterfly Labs, Sonny Vleisides, Darla Jo Drake a/k/a Jody Drake, Jeff Ownby, and Joshua Zerlan (collectively ("Defendants").

## NATURE OF THE ACTION

1.     Plaintiff seeks recovery of the purchase price and consequential damages for Bitcoin mining machines Plaintiff purchased from Defendants but which Plaintiff never received, and for which Plaintiff never received a refund, despite multiple promises of a refund over several years.

2.     This suit also seeks treble damages and attorneys' fees under RICO for Defendants' illegal scheme to obtain customers' money by making fraudulent statements via mail, wire, and the internet, omitting and concealing material information in order to induce customers to make pre-payments for non-existent Bitcoin mining equipment, failing to ship Bitcoin mining equipment orders for which Plaintiff pre-paid, profiting from Bitcoin mining for Defendants' own benefit using Plaintiff's equipment without permission or authorization from Plaintiff, and retaining both the prepayments and the equipment ordered by Plaintiff without providing a refund.

## PARTIES, JURISDICTION & VENUE

3.     Plaintiff Marc Bevand is a natural person, a French citizen, and a permanent resident of the State of Missouri.

4.     Defendant BF Labs, Inc. d/b/a Butterfly Labs ("BFL"), is a Wyoming corporation with its principal place of business at 10770 El Monte Street, Leawood, KS 66211.

2

5.     Defendant Sonny Vleisides ("Vleisides") is a natural person and a citizen of the State of Missouri.

6.     At all relevant times, Vleisides was a founder, part owner, Innovation Officer and Vice President of Product Development of BFL, who, individually, and in concert with others, controlled the acts and practices of BFL generally and as alleged herein, had actual or constructive knowledge of the acts and practices alleged herein, and committed or participated in the acts and practices alleged herein.

7.     Defendant Darla Jo Drake a/k/a Jody Drake ("Drake") is a natural person and a citizen of the State of Kansas.

8.     At all relevant times, Drake was the General Manager at BFL, and also served as the Secretary and Treasurer of BFL, who, individually, and in concert with others, controlled the acts and practices of BFL generally and as alleged herein, had actual or constructive knowledge of the acts and practices alleged herein, and committed or participated in the acts and practices alleged herein.

9.     Defendant Jeff Ownby ("Ownby") is a natural person and a citizen of the State of Illinois.

10.     At all relevant times, Ownby was a part owner and Vice President of Marketing and E-commerce of BFL who, individually, and in concert with others, controlled the acts and practices of BFL generally and as alleged herein, had actual or constructive knowledge of the acts and practices alleged herein, and committed or participated in the acts and practices alleged herein.

11.     Defendant Joshua Zerlan is a natural person and is a citizen of the State of Kansas.

12.     At all relevant times, Zerlan was Operations Manager, Chief Operating Officer, and Vice President of Product Development of BFL who, individually, and in concert with others,

controlled the acts and practices of BFL generally and as alleged herein, had actual or constructive knowledge of the acts and practices alleged herein, and committed or participated in the acts and practices alleged herein.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S. C. § 1331 and 28 U.S.C. § 1367.

14.     Venue is proper in this Court pursuant to 28 U.S. C. § 1391 in that a substantial part of the events or omissions giving rise to the claim occurred in the Western District of Missouri.

15.     The amount in controversy herein is in excess of $75,000.00.

## FACTUAL ALLEGATIONS

### Background on Bitcoin and Bitcoin Mining

16.     Bitcoin is a payment system that is also referred to as a "virtual currency."

17.     Bitcoins can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other physical or virtual currencies. Bitcoin users can send payments to another for goods and services through online entities.

18.     Bitcoins are increasingly used worldwide to pay debts, purchase goods and services, and are regularly exchanged for other currencies.

19.     Unlike traditional currency, Bitcoins are not created by a government or central bank, such as the Federal Reserve.

20.     Bitcoins can only be generated through a process called Bitcoin "mining," a process where "miners" receive transaction fees and newly minted Bitcoins in return for using computers or other devices to solve computational puzzles.

21.     Solving these computational puzzles also has the effect of verifying and recording payments made using Bitcoin.

4

22. By design, Bitcoin mining is a computationally intensive process that becomes more difficult over time.

23. As more miners have joined the Bitcoin network, it has become increasingly difficult to solve the computational puzzles and make a profit. Therefore, miners must seek faster and faster equipment, and must seek efficiencies to cut their operating costs, which includes high electricity bills and wear-and-tear on the mining machines.

24. As the difficulty of Bitcoin mining has increased over time, the computer hardware required to profitably mine has advanced from general purpose CPUs (found in common desktop computers), high-end GPUs (often found in gaming computers), FPGAs (field-programmable gate arrays), and ultimately to ASICs (application-specific integrated circuits) purpose-built for performing the calculations necessary for Bitcoin mining.

25. With the development and release of each new generation of mining technology, previous generations become effectively obsolete and worthless

26. Although the total number of Bitcoins in circulation is increasing, the number is increasing at a slowing rate, and, at some point, Bitcoins will cease to be generated altogether. Specifically, roughly every four years that the Bitcoin network operates, half the number of Bitcoins are created as compared to the prior four years. All Bitcoins are expected to be mined by 2140.

27. The faster one is able to mine Bitcoins, the more money one may make.

28. Bitcoins have significant monetary value that constantly fluctuates.

29. For example, in November 2013, the price of one Bitcoin skyrocketed above $1,000.

30. On March 19, 2014, one Bitcoin could be exchanged for an average of $613.12.

5

31.     On August 20, 2015, one Bitcoin could be exchanged for an average of $233.48.

32.     Bitcoin experts predict that the value of one Bitcoin may fall even further or may increase to as high as $35,000.

33.     Time is of the essence when it comes to Bitcoin mining.

**Defendants' Sale of Bitcoin Mining Machines**

34.     Defendants purport to manufacture and sell Bitcoin mining machines and services that consumers can use to generate Bitcoins. Defendants also purport to sell the latest generations of Bitcoin mining machines.

35.     Defendants market their Bitcoin mining machines and services for sale online, including on Facebook, as well as on their own website, www.butterflylabs.com.

36.     Defendants purport to sell these machines nationwide in interstate commerce.

37.     Defendants stated on their website that "Butterfly Labs manufactures a line of high speed encryption processors for use in Bitcoin mining, research, telecommunication and security applications." The website describes products for sale and their prices, delivery dates, and terms and conditions of sale. It touts the low power consumption and high efficiency and processing speed of Defendants' mining machines.

38.     For all orders, Defendants have required consumers to pay up-front by PayPal, Bitcoins, or bank wire transfer the entire amount of an order at the time the order is placed.

**Defendants' "Pre-Order" Scheme**

39.     Defendants created a scheme to obtain "pre-order" funds from the public, but contrary to its representations to customers, diverted these funds to other purposes, including their own personal enrichment.

6

40.    BFL advertises via "pre-order" sale Bitcoin mining products they hoped to design and manufacture, without disclosing the products did not yet exist, that there was no final working prototype, that unless enough pre-orders were made by customers, BFL would not have sufficient funds to develop and manufacture the advertised products at all, and without disclosing BFL's intent to use the products for its own benefit and enrichment prior to shipping or in lieu of shipping.

41.    BFL's pre-order scheme was deceptive because it was not really a pre-order system but, rather, it was a method of raising investment capital under the guise of a pre-order.

42.    In order to encourage and to entice paid-in-full "pre-orders" from customers, BFL advertised its high-speed miners were shipping soon—even though BFL did not know whether it would receive sufficient pre-order funds to ever develop or manufacture the product advertised.

43.    BFL represented its Bitcoin mining products were "in production" and "real."

44.    BFL represented that customers would most likely receive their equipment within "two months" after ordering, or such equipment "would be shipped in two months," or sooner.

45.    BFL's products did not exist at the time BFL accepted pre-payments.

46.    BFL knew or had reason to know that the products would not ship on the dates represented to customers.

47.    A former employee testified it was BFL's "company policy" to inform prospective customers that delivery was "two months away" and even sooner for existing customers, even though the two-month timeframe was not tied to supply chain or the engineering timeline and no final prototype for the machines existed.

48.    A former employee recommended to company management that customers be provided with information about delivery delays but his recommendation was dismissed, and the

reason provided was BFL did not want customers to know that they would have to wait so long for the machines.

49.     To reinforce and to continue the pre-order scheme, BFL falsely advised customers that shipping had already begun; at the same time, BFL continued receiving prepayments.

50.     BFL did not ship its products within two months or within any time period represented by BFL.

51.     In or about 2012, BFL purchased from Zerlan a business known as "Eclipse Mining Consortium," which operates as a Bitcoin mining pool, an organization which permits the combination of Bitcoin mining efforts.

52.     Instead of shipping completed Bitcoin mining hardware to customers after customers have already paid for the equipment, BFL utilized completed Bitcoin mining hardware to earn mining income for itself under the guise of "testing" such hardware.

53.     BFL represented it did not mine Bitcoins for itself, but, in reality, without authorization or permission, BFL mined Bitcoins for itself using customer equipment on each and every unit before shipping to customers.

54.     BFL mined using customers' equipment on the live Bitcoin network for hours, days, or longer even though the equipment only required 10 to 30 minutes of testing and could have been tested on "test.net," which enables the equipment to be tested without being used.

55.     BFL used customers' equipment on the live Bitcoin network instead of on the test-net because BFL would not make any money for itself using the test-net.

56.     Instead of shipping manufactured and fully tested miners to customers, BFL kept them and operated them on the live Bitcoin network for BFL's benefit and enrichment until

8

additional replacement miners were manufactured so that BFL could keep the same number of miners operating on the live Bitcoin network.

57.     This "testing" served to enrich BFL at the detriment of its customers by both denying customers use and benefit of equipment they have already paid for, as well as increasing the overall mining difficulty required to generate future Bitcoins.

58.     Instead of shipping to customers, BFL also sent hundreds or thousands of miners to Netsolus to mine Bitcoins for itself.

59.     BFL claims the miners sent to Netsolus were "defective," yet BFL was able to mine substantial Bitcoins for itself using such miners.

60.     BFL represented customers could receive a refund simply by asking for one, that "it's not a problem" for a customer to receive a refund, and BFL could refund all prepayments "without a problem."

61.     Even after mining units became effectively obsolete due to the length of time customers were waiting for BFL to ship, customers were not allowed to obtain a refund even if they refused delivery.

62.     A former employee testified that, per management's instructions, BFL would keep both the mining units and customers' funds.

63.     BFL used customers' funds for the individual benefit of BFL's officers and shareholders, including Vleisides, Drake, Ghoseiri, Ownby, and Zerlan.

64.     For example, BFL purchased a home and a $66,171.27 car for Vleisides.

9

**Plaintiff's Purchase Order**

65.     On Aug 17, 2013, Plaintiff Marc Bevand ("Bevand") placed a purchase order on BFL's website for nine (9) standard "Monarch" units, each of which purportedly consisted of a 600 GH/s Bitcoin mining card.

66.     The total amount Bevand paid for these nine units was $31,632.00, which included $42.00 in shipping. This amount was paid in Bitcoins, which at then-current exchange rate was 319.0192 BTC.

67.     As of March 21, 2014, the units had not shipped.

68.     On that date, BFL offered to either (1) refund the amount paid by Bevand or (2) upgrade his pending order to nine (9) "Imperial Monarch" units in addition to the nine (9) standard "Monarch" units he had already ordered by simply paying an extra "shipping" fee of $342.00.

69.     Mr. Bevand chose option (2), and paid the additional $342.00 to BFL, bringing the amount of his total payments to BFL to $31,974.00.

70.     On August 29, 2014 BFL sent an email to Bevand saying they were now finally ready to ship his order, but that they had reduced their prices. If Bevand wanted to take advantage of this new pricing, this would "result in a new configuration of your order and replace all previous offers."

71.     This time, given that BFL had previously made such an "upgrade" offer and then failed to deliver, Bevand responded by requesting a refund.

72.     As of August 28, 2014, BFL stated on its website that it would offer refunds to those who would prefer cancelling their order.

73.     On September 15, 2014, "Davis W" from BFL stated that Bevand's refund request was "approved."

74.     On December 31, 2014, BFL sent Bevand an email informing him that the FTC had frozen BFL's assets but that the company would regain control of their accounts by that same day.

75.     Bevand followed up multiple times demanding his refund from BFL between January 8, 2015 and the present day.

76.     To date, Bevand has received no equipment nor any refund from BFL.

77.     Since placing his order with BFL in August of 2013, numerous Bitcoins have been mined by BFL and others, and the difficulty of mining new Bitcoins has substantially increased over such time.

**Pattern of Racketeering Activity**

78.     In addition to Defendants' conduct with respect to Plaintiff, Defendants have engaged in similar fraudulent conduct with respect to many other customers, as set forth herein, constituting a pattern of racketeering activity.

79.     In June 2012, Defendants' website advertised its line of "BitForce SC chip" (hereinafter, "BitForce") mining machines. At the time, the BitForce mining machines purported to allow consumers to use the latest technology for Bitcoin mining.

80.     Defendants' BitForce mining machines ranged in price from $149 for their lowest power machine to $29,899 for their highest power machine.

81.     Beginning in June 2012, Defendants informed consumers that the BitForce mining machine "is now in final state development. Initial product delivery is scheduled for October 2012." However, Defendants did not deliver any BitForce mining machines to its customers in October 2012.  Indeed, by April 1, 2013, Defendants still had not delivered a single BitForce mining machine to their customers.

11

82. Many months later, as of September 2013, Defendants had failed to ship mining machines to more than 20,000 customers who had paid for the equipment in full.

83. On November 28, 2013, Defendants posted on their website that all the orders for the BitForce mining machines had been shipped. However, consumers continued to file complaints about not receiving their prepaid BitForce mining machine.

84. In approximately August 2013, Defendants announced that they were selling Monarch mining machines, which purportedly possessed greater mining power than any of the previous mining machines in the market. Butterfly Labs stated that the Monarch is the "fastest and most power efficient Bitcoin miner yet." Defendants required consumers to pay $2,499 to $4,680 upfront to purchase the machines.

85. In fact, as of the end of 2014, Defendants had yet to provide consumers with a single Monarch machine, despite Defendants' representation that the machines should be delivered by the "end of the year [2013]." Months later, in approximately March 2014, Defendants stated that they would provide consumers with Monarch machines in April 2014.

86. In numerous instances, consumers were not able to generate Bitcoins using the BitForce or Monarch Bitcoin mining machines because Defendants did not fulfill consumers' orders.

87. In numerous instances, Defendants eventually delivered a BitForce that was either defective, obsolete, or mining far less Bitcoins than it would have had it shipped on the promised shipment dates.

88. In approximately December 2013, Defendants began offering mining services, at an average upfront cost of approximately $10/GH for 12 months, whereby Butterfly Labs supposedly would use the Monarch mining machines to generate Bitcoins for the consumer.

12

89.     Butterfly Labs stated that they would begin generating Bitcoins for consumers who paid for these services in the "March 2014 time frame." Defendants failed to do so. In fact, as of August 2014, Defendants had not generated any Bitcoins for consumers who had purchased the mining services, often at a cost of thousands of dollars per consumer.

**COUNT I**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT, 18 U.S.C. § 1964(c) ("RICO")**
**(against the Individual Defendants)**

90.     Plaintiff re-alleges and incorporates by reference all other Paragraphs of this Complaint as if fully set forth herein.

91.     This Count is against Defendants Sonny Vleisides, Darla Jo Drake a/k/a Jody Drake, Jeff Ownby, and Joshua Zerlan (the "Individual Defendants").

92.     BF Labs, Inc. d/b/a Butterfly Labs is an enterprise engaged in and whose activities affect interstate commerce. The Individual Defendants are employed by or associated with the enterprise, and operate and manage its affairs.

93.     Pursuant to and in furtherance of their fraudulent scheme, each of the Individual Defendants committed multiple related acts of mail fraud and wire fraud, as defined in 18 U.S.C. § 1961, specifically, Defendants used the internet and the mail, in interstate commerce, with the intent to conduct the unlawful activity of fraud, as described herein, and obtained money by means of false and fraudulent pretenses in violation of 18 U.S.C. § 1341.

94.     Pursuant to and in furtherance of their fraudulent scheme, each of the Individual Defendants committed multiple related acts of wire, radio or television fraud, as defined in 18 U.S.C. § 1961, specifically, Defendants transmitted communications by wire, radio, or television, in interstate commerce, with the intent to conduct the unlawful activity of fraud, as described herein, and obtained money by means of false and fraudulent pretenses in violation of 18 U.S.C.

13

§ 1343.

95.     Plaintiff relied, to his detriment, on the fraudulent representations of the Individual Defendants.

96.     The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically,

a.     The Individual Defendants collected numerous payments from numerous customers, including Plaintiff, for Bitcoin mining machines they never intended to deliver, as described herein, over a period of time, including but not limited to, between June 2012 and December 31, 2014; and

b.     The Individual Defendants advertised the availability of Bitcoin mining machines they never intended to deliver, as described herein, over a period of time, including but not limited to, between June 2012 and December 31, 2014; and

c.     The Individual Defendants routinely delayed delivery of Bitcoin mining machines in order to use them for their own mining purposes, rendering the products useless when they were ultimately delivered; and

d.     The Individual Defendants participated in this scheme by developing and executing the scheme to defraud, and by training and supervising others at BFL to perpetrate the fraud described herein.

97.     The acts set forth herein, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

98.     The Individual Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described

14

above, in violation of 18 U.S.C. § 1962(c).

99.     As a direct and proximate result of the Individual Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property, including loss of the amounts paid to Defendants, consequential damages, interest, lost profits and attorneys' fees, as described herein.

WHEREFORE, Plaintiff requests that this Court enter judgment against the Individual Defendants as requested in the Request for Relief set forth below in this Complaint, including treble damages and attorneys' fees.

## COUNT II
## BREACH OF CONTRACT
### (against all Defendants)

100.    Plaintiff re-alleges and incorporates by reference all other Paragraphs of this Complaint as if fully set forth herein.

101.    On or about August 17, 2013 Plaintiff placed on order on BFL's website for nine (9) standard "Monarch" Bitcoin mining cards, for which he paid $31,632.00.

102.    On March 21, 2014, BFL offered to either provide a refund or "upgrade" Plaintiff's order by adding nine (9) "Imperial Monarch" Bitcoin mining cards if Plaintiff paid an additional $342.00; an offer which Plaintiff accepted.

103.    On September 2014, having not received any refund or merchandise, Plaintiff requested a refund.

104.    Despite repeated demand, Defendants have failed and refused, and still fail and refuse to pay Plaintiff a refund.

105.    Defendant breached the contract by failing to timely deliver the machines.

106.    To date, Plaintiff has received neither the machines he ordered nor any refund.

15

107. Implicit in the contract for purchase of the Bitcoin mining machines was that time is of the essence, since Bitcoin mining machines rapidly become obsolete, as discussed herein.

108. Delivery of the machines at this time would therefore be of no benefit to Plaintiff.

109. Had the machines been timely delivered, or had Plaintiff's money been timely returned, Plaintiff would have earned profits from Bitcoin mining, in an amount which can be calculated with reasonable certainty.

110. As a result of Defendants' breach, Plaintiff suffered damage, including loss of the amounts paid to Defendants, consequential damages, interest, lost profits, and attorneys' fees.

111. Plaintiff is therefore entitled to a refund of the amounts he paid to Defendants as the purchase price for the Bitcoin mining machines, plus consequential damages, interest, lost profits, and attorneys' fees.

WHEREFORE, Plaintiff prays for the relief requested in the Request for Relief set forth below in this Complaint.

## COUNT III
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT (REV. STAT. MO. §§ 407.010, et seq.)
#### (against all Defendants)

112. Plaintiff re-alleges and incorporates by reference all other Paragraphs of this Complaint as if fully set forth herein.

113. This Count is brought to secure redress for the unlawful, deceptive and unfair trade practices perpetrated by Defendants.

114. Defendants have violated and continue to violate § 407.020 of the MMPA in connection with the sale and advertisement of their Products in sale or commerce as described herein.

115. MO. REV. STAT. § 407.020 provides, in pertinent part, as follows:

16

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice . . . Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale advertisement or solicitation.

116.     The Missouri Merchandising Practices Act further provides for a civil action to recover damages in MO. REV. STAT. § 407.025.1, as follows:

Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award punitive damages and may award to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper.

117.     Any act, use or employment declared unlawful by § 407.020 of the MMPA violates that subsection, whether committed before, during or after the sale, advertisement or solicitation.

118.     Section 407.010(4) of the MMPA defines "merchandise" as any objects, wares, goods, commodities, intangibles, real estate or services.

119.     Defendant's Products are merchandise under this provision of the MMPA. Defendant has, therefore, sold merchandise in the State of Missouri as that term is defined in § 407.010(4).

120.     Plaintiffs purchased Defendant's Products.

121.     Such purchase of Defendant's Products was primarily for personal, family, or household purposes.

17

122.    Defendants violated the MMPA by willfully failing to state a material fact or willfully concealing, suppressing, or omitting material facts, in connection with the sale and advertisement of the Bitcoin mining machines Plaintiff purchased from them, including:

a.  the lack of sufficient capital to design, develop, and manufacture the advertised products;

b.  the inability to design, develop, and manufacture the advertised products unless and until a certain number of pre-orders were received;

c.  the advertised products were not in the final stage of development;

d.  the advertised products were not functional;

e.  no final working prototype existed;

f.  the lack of chips necessary to produce the advertised products;

g.  shipping would not occur as represented, anywhere close to as represented, or ever;

h.  shipping representations were not tied to the supply chain or engineering timeline;

i.  intent to design, develop, and manufacture miners for Defendants' benefit;

j.  intent to delay or avoid shipment of miners;

k.  intent to delay or avoid providing refunds;

l.  intent to keep the customers' prepayments and the products ordered;

m.  each miner is used on the live Bitcoin network for Defendants' benefit prior to shipping;

n.  even after sufficient testing had occurred, miners are used on the live Bitcoin network for Defendants' benefit until replacement miners are manufactured;

o.  numerous miners were to be sent to Netsolus for self-mining instead of shipping to customers; and

p.  the general scheme as alleged herein.

18

123. Defendant's concealment, suppression, misrepresentations and omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff.

124. In violation of the MMPA, Defendants employed fraud, deception, false promise, misrepresentation, and the knowing concealment, suppression, or omission of material facts in their sale and advertisement of their products in the State of Missouri.

125. Defendants engaged in the concealment, suppression, misrepresentation and omission of the aforementioned material facts with the intent that others, such as Plaintiff, and the general public, would rely upon the concealment, suppression, misrepresentation and omission of such material facts and purchase their products.

126. As a result of his purchase as described herein, Plaintiff sustained ascertainable loss and damage in that, among other things, he paid the purchase price but never received the equipment, he was unable to mine Bitcoins using the equipment, could not make alternate arrangements to mine Bitcoins using those funds, and has incurred attorneys' fees.

127. Plaintiff is entitled to recover actual damages, attorneys' fees, and injunctive or other equitable relief, pursuant to Missouri law, including MO. REV. STAT. § 407.025.

128. Furthermore, Defendant's unlawful conduct set forth in this Complaint was and is outrageous because of Defendant's evil motive or reckless indifference to and conscious disregard of the rights of others and for the rights of Plaintiff, and warrants an award of punitive damages to deter Defendant, and others in similar circumstances, from committing such actions in the future.

WHEREFORE, Plaintiff prays for the relief requested in the Request for Relief set forth below in this Complaint.

## COUNT IV
## CONVERSION
### (against all Defendants)

129.    Plaintiff re-alleges and incorporates by reference all other Paragraphs of this Complaint as if fully set forth herein.

130.    Plaintiff paid money to Defendants for the purposes of purchasing Bitcoin mining equipment consonant with the representations made by Defendants.

131.    Plaintiff has an ownership interest in such money until a condition is satisfied, i.e., until Defendants provides the Bitcoin mining equipment.

132.    Plaintiff never authorized Defendants to keep and use his money without providing Bitcoin mining equipment or for any purpose other than to timely manufacture and ship the Bitcoin mining equipment to Plaintiffs.

133.    Without authorization, Defendants assumed or exercised the right of ownership and possession over Plaintiff's money by using such money for purposes other than timely manufacturing and shipping the Bitcoin mining equipment to Plaintiff.

134.    During Defendants' exercise of unauthorized ownership and possession over Plaintiff's money, Plaintiffs were excluded from exercising their ownership and possession rights over the money.

135.    Further, by paying for and purchasing Bitcoin mining equipment from Defendants, Plaintiffs had an ownership interest in such Bitcoin mining equipment.

136.    After Plaintiff's Bitcoin mining equipment was manufactured, but before shipping such Bitcoin mining equipment to Plaintiffs, Defendants used Plaintiff's Bitcoin mining equipment to mine Bitcoins for Defendants' own use, benefit, and enrichment.

137.    Plaintiffs never authorized Defendant to keep and use their Bitcoin mining equipment to mine Bitcoins for Defendants' own use, benefit, and enrichment.

138.    Without authorization, Defendants assumed or exercised the right of ownership and possession over Plaintiff's Bitcoin mining equipment by keeping and using Plaintiff's Bitcoin mining equipment to mine Bitcoins for Defendants' own use, benefit, and enrichment before shipping such equipment to Plaintiffs.

139.    During Defendants' exercise of unauthorized ownership and possession over Plaintiff's Bitcoin mining equipment, Plaintiffs were excluded from exercising their ownership and possession rights over the Bitcoin mining equipment.

140.    On September 24, 2014, among other times, Plaintiff demanded BFL return the money he paid, but to no avail.

141.    As a direct and proximate result of Defendants' conversion of Plaintiff's money, Bitcoins, and Bitcoin mining equipment, Plaintiff was aggrieved and suffered an ascertainable loss, including, but not limited to: the purchase price and interest thereon, the loss of use of equipment ordered, the loss of Bitcoins which were mined by Defendants prior to shipping, costs of suit, and attorney's fees.

WHEREFORE, Plaintiff prays for the relief requested in the Request for Relief set forth below in this Complaint.

## COUNT V
## UNJUST ENRICHMENT
### (against all Defendants)

142.    Plaintiffs re-allege and incorporate by reference all other Paragraphs of this Complaint as if fully set forth herein.

143.    A benefit was conferred on Defendants in that Plaintiff paid money to Defendants.

144.     A benefit was conferred on Defendants in that Defendants used Plaintiff's mining equipment to mine Bitcoins for themselves.

145.     Defendants accepted and appreciated the money from Plaintiffs and had knowledge of such facts.

146.     Defendants accepted and appreciated the use of Plaintiff's mining equipment and the Bitcoins it mined for itself using Plaintiff's mining equipment and had knowledge of such facts.

147.     To date, Defendants have retained such benefits in that Defendants have retained and used Plaintiff's money without paying for its value or increased value over time.

148.     To date, Defendants have retained such benefits in that Defendants have retained the Bitcoins it mined for itself using Plaintiff's mining equipment without paying for the use of Plaintiff's mining equipment or the value or increased value of Bitcoins mined over time.

149.     Under the circumstances, Defendants' acceptance and retention of the money or Bitcoins, and use of Plaintiff's mining equipment and retention of Bitcoins mined therefrom, without paying for its value, is inequitable because:

    a.     Defendants have either not provided the mining equipment it promised to ship to Plaintiff in exchange for the money paid by Plaintiff or have used the equipment for Defendants' own enrichment, to Plaintiff's detriment, before providing the equipment;

    b.     even if Defendants immediately provided the mining equipment to Plaintiff, the equipment is now essentially worthless to Plaintiff;

    c.     the money and Bitcoins retained by Defendants have increased in value over time;

    d.     Plaintiff never gave Defendants permission to use his mining equipment to mine Bitcoins for itself or for anyone else;

    e.     Defendants have benefitted from the increase in value in money and Bitcoins over time and have used this money and Bitcoins to purchase houses and cars, to make loans, to exchange into dollars, to pay expenses, or to develop and manufacture mining equipment for its own use and benefit; and

f.   Defendants' retention of the money or Bitcoins over time has resulted in additional profits from mining that could have been earned by Plaintiff had Defendants timely shipped the mining equipment to Plaintiff.

150.   As a direct and proximate result of Defendants' deceptive and unconscionable acts and practices, Plaintiff was aggrieved and has suffered an ascertainable loss, including, but not limited to: the purchase price and interest thereon, the loss of use of equipment ordered, the loss of Bitcoins which were mined by Defendants prior to shipping, costs of suit, and attorney's fees.

151.   The imposition of a constructive trust on the money and Bitcoins paid to Defendants and the Bitcoins mined by Defendants prior to shipping is warranted given Defendants' unlawful conduct described above.

WHEREFORE, Plaintiff prays for the relief requested in the Request for Relief set forth below in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, having stated the foregoing allegations and claims, Plaintiff Marc Bevand prays that this Court:

A.   Enter judgment against Defendants, for a fair and reasonable amount in excess of $75,000.00, and for interest, together with her attorneys' fees and costs, and punitive damages;

B.   Award to Plaintiff all remedies available to him in law and equity, including but not limited to: awards of actual or compensatory damages, incidental or consequential damages, or restitution, in such amounts to be determined at trial, with punitive damages, treble or other multiple or enhanced damages, or penalties where permitted by law, in amounts determined at trial, and declaratory relief as appropriate;

C.   Award Plaintiff his costs of suit in the present suit, including any reasonable attorneys' fees and expenses, to include expert witness fees, as provided by law;

23

D. Order that Defendants be enjoined from continuing the deceptive and unlawful marketing and sales practices described herein, including a permanent injunction; and

E. Award to Plaintiff such other, further, and different relief as the nature of the case may require, or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR JURY

Plaintiff respectfully demands a jury trial on all issues so triable.


Respectfully submitted,

KEANE LAW LLC

/s/ Alex Braitberg
Ryan Keane, #62112MO
Alex Braitberg, #67045MO
9666 Olive Blvd., Ste. 690
St. Louis, MO 63132
Phone: (314) 240-5278
ryan@keanelawllc.com
alex@keanelawllc.com
*ATTORNEYS FOR PLAINTIFF*

24